## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION AS LEGAL TITLE TRUSTEE FOR TRUMAN 2016 SC6 TITLE TRUST, <br><br>        PLAINTIFFS, <br><br> v. <br><br> ROBERT TED BROWN; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; AND INTERNAL REVENUE SERVICE, <br><br>        DEFENDANTS. | ) ) ) ) ) ) ) C.A. No. 21-CV-00198-JJM-PAS ) ) ) ) ) ) ) ) |

### AFFIDAVIT OF LENDER IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BEFORE ME this day personally appeared _____Elizabeth Corral_____, (Affiant) who, first being duly sworn, deposes on personal knowledge and says:

1. I am a _____Default Fulfillment Manager_____ (title) of Carrington Mortgage Services, LLC the mortgage loan servicer and attorney in fact for the Plaintiff, U.S. Bank National Association as legal title Trustee for Truman 2016 SC6 Title Trust. As servicer, Carrington is responsible for the collection of this loan transaction and pursuing of any delinquency in payments.

2. Affiant is authorized to make this affidavit on behalf of the Plaintiff as mortgage loan servicer for Plaintiff's loan. In the regular performance of my job functions, I have access to Carrington's business records, including the business records maintained from any prior servicers of this loan, if any, and loan documents and loan account records that were either created or verified (to the extent any payments were received by prior servicers) by Carrington. I also have personal knowledge of the operation of and the circumstances surrounding the preparation, maintenance, and retrieval of records from Carrington's record keeping systems. These records (which include without limitation data compilations, electronically imaged documents, loan notes, and other data entries) are made at or near the time by, or from information provided by persons with knowledge of the activity and transactions reflected in such records and are kept in the regular course of Carrington's mortgage servicing business activity.

3. In addition, as a mortgage loan servicer, Carrington's, business records include records pertaining to the loans it services which were created by others, including but not limited to records of prior servicers, original documents such as promissory notes, mortgages, title insurance policies and documents pertaining to the origination of the loans, including but not limited to the documents signed at the closing of the mortgage loan. The records from

1

these servicers also include payment records, payment histories, and other accountings to reflect payments due and payments made. To the extent records are received from prior servicers, they were reviewed by Carrington, upon becoming the servicer of this loan to identify any irregularities in the documentation or records received and to verify that all payments previously received were properly applied to the account at issue. Once the documents are verified, those records are thereafter incorporated into Carrington's business records, similar to the manner in which the records would have been created had Carrington serviced the loan from its inception. Based on my familiarity with industry standards, it is common practice in the mortgage servicing industry for a mortgage loan servicer to receive, review, and rely on a prior servicer's business records in instances where a loan account is transferred from one servicing entity to another.

4. On May 31, 2006, the Defendant/Borrower, Robert Ted Brown, acquired title to the subject property, located at 199 Hudson Pond Road, West Greenwich, Rhode Island by deed recorded with the West Greenwich Land Evidence Records in Book 318, Page 14. A true and accurate copy of the Borrower's Deed is attached hereto as **Exhibit A**.

5. On May 31, 2006, Mr. Brown executed a promissory note made payable to New Century Mortgage Corporation in the original principal amount of $414,400.00. The Note was subsequently endorsed in blank and the Plaintiff is currently the holder of the Note. A true and accurate copy of the Note is attached hereto as **Exhibit B**.

6. Also on May 31, 2006, the Borrower granted a mortgage to Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for New Century Mortgage Corporation, its successor and assigns, encumbering the Property as security for the Note. The Mortgage was recorded with the West Greenwich Land Evidence Records in Book 318, Page 16. A true and accurate copy of the Mortgage is attached hereto as **Exhibit C**.

7. On March 12, 2007, Countrywide Bank, N.A. changed its name to Countrywide Bank, FSB, according to records obtained from the Federal Deposit Insurance Corporation (FDIC). A true and accurate copy of the FDIC public records are attached hereto as **Exhibit D**.

8. On April 23, 2009, the Office of the Comptroller of the Currency (OCC) granted conditional approval for the merger of Countrywide Bank, FSB to Bank of America, N.A. A true and accurate copy of the Comptroller's Conditional Approval is attached hereto as **Exhibit E**.

9. On December 2, 2011, MERS assigned its title interest to Bank of America, National Association by assignment of mortgage recorded with the West Greenwich Land Evidence Records in Book 411, Page 102. A true and accurate copy of the First Assignment is attached hereto as **Exhibit F**.

10. On April 15, 2014, Bank of America assigned the Mortgage to Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual capacity, but as Trustee of ARLP Trust 3 by assignment of mortgage recorded with the West Greenwich Land

2

Evidence Records in Book 459, Page 198. A true and accurate copy of the Second Assignment is attached hereto as **Exhibit G**.

11. On March 20, 2015, Christiana Trust assigned the Mortgage to Wilmington Trust, National Association, not in its individual capacity but as Trustee of ARLP Securitization Trust, Series 2014-1 by assignment of mortgage recorded with the West Greenwich Land Evidence Records in Book 472, Page 172. A true and accurate copy of the Third Assignment is attached hereto as **Exhibit H**.

12. On October 1, 2015, Mr. Brown defaulted under the terms of the Note and Mortgage for nonpayment of the monthly installments.

13. On April 17, 2017, the prior loan servicer mailed a notice of default ("Default Notice") addressed to the Subject Property, being the only address on record for Mr. Brown. A true and accurate copy of the Default Notice is attached hereto as **Exhibit I**.

14. On June 29, 2017, Wilmington Trust assigned the Mortgage to the Plaintiff by assignment of mortgage recorded with the West Greenwich Land Evidence Records in Book 516, Page 104. A true and accurate copy of the Fourth Assignment is attached hereto as **Exhibit J**.

15. On June 30, 2017, Plaintiff's prior counsel mailed a notice of acceleration, advising Mr. Brown of his rights under the Fair Debt Collection Practices Act (FDCPA). A true and accurate copy of the Acceleration Notice is attached hereto as **Exhibit K**.

16. A review of the West Greenwich Land Evidence Records reveals the following junior lienholders of record attaching to the Property:

    a. On or about May 31, 2006, Mr. Brown granted a junior mortgage to MERS as nominee for New Century, its successors and assigns, in the original principal amount of $51,800.00, recorded with the West Greenwich Land Evidence Records in Book 318, Page 32.

    b. On May 7, 2012, the Internal Revenue Service recorded multiple notices of federal tax lien with the West Greenwich Land Evidence Records in Book 431, Page 92, Book 499, Page 190, Book 515, Page 223, Book 541, Page 98, and 547, Page 98.

17. Based upon my review of the business records for this loan, the default has not been cured and the Mortgage has not been reinstated or redeemed by the Defendants.

18. Since February 2024, monthly mortgage statements have been mailed to Mr. Brown's counsel of record. Prior to February 2024, monthly mortgage statements have always been mailed to the Property.

19. Mr. Brown has never contacted Plaintiff's loan servicer indicating that he would like to change his mailing address.

3

20. .

EXECUTED UNDER THE PAINS AND PENALTIES OF PERJURY.

U.S. Bank National Association as legal title Trustee for Truman 2016 SC6 Title Trust, by Carrington Mortgage Services, LLC as attorney in fact

BY: _____    OCT 3 0 2025

Name:        Elizabeth Corral

Title:       Default Fulfillment Manager

STATE OF _____

COUNTY OF _____

Sworn to and subscribed before me this _____ day of _____, 20_____.

Alex Ramos Cruz

_____

Notary Public

Printed Name: _____ See Attached

My Commission Expires: _____

4

Lender Affidavit

US Bank v. Brown

21-cv-00198-JJM-PAS

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

# JURAT

State of California
County of Orange

Subscribed and sworn to (or affirmed) before me on this 30th of October 2025 **Elizabeth Corral**, proved to me on the basis of satisfactory evidence to be the person who appeared before me.



Signature Alex Ramos Cruz

ALEX RAMOS CRUZ
Notary Public - California
Los Angeles County
Commission # 2458293
My Comm. Expires Aug 8, 2027

---

## OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

_____
(Additional information)

### INSTRUCTIONS FOR COMPLETING THIS FORM

_The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process._

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form
  - ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document

# EXHIBIT A

BK318PG014

## WARRANTY DEED

I, Diane Guilmette, of the Town of West Greenwich, County of Kent, State of Rhode Island,

For consideration paid, hereby grants to Robert Ted Brown as sole owner

with WARRANTY COVENANTS.

### DESCRIPTION

SEE EXHIBIT "A" ATTACHED HERETO.

I, Diane Guilmette, do hereby covenant that I am a resident of the State of Rhode Island in compliance with RIGL 44-30-71.3.

The undersigned grantors do hereby covenant that the property is in compliance with the Section 8 of the Rhode Island fire code relative to smoke detectors and carbon monoxide detectors.

WITNESS my hand this 31st day of May, 2006.

Diane Guilmette

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick on the 31st day of May, 2006, before me personally appeared Diane Guilmette, to me known and known by me to be the party executing the foregoing instrument, and she acknowledged said instrument by her executed, to be her free act and deed.

Notary Public: Joseph J. DeAngelis,
My Commission Expires: 06/25/09

GRANTEES ADDRESS:
199 Hudson Pond Road
West Greenwich, RI 02817

BK3180PG015

EXHIBIT "A"

That certain parcel of land situated on the westerly side of Liberty Road in the Town of West Greenwich, County of Kent, State of Rhode Island and Providence Plantations, bounded and described as follows;

Beginning at the northeasterly corner of said parcel, at a steel rebar on the westerly street line of Liberty Road, 3950, more or less, feet northerly of the intersection with Falls River Road, at the southeasterly corner of land now or formerly of this grantor;

Thence southerly along the westerly line of Liberty Road for a distance of one hundred seven and thirty-seven hundredths (107.37') feet to an angle point in said road;

Thence turning an interior angle of 183° -49' -04" and continuing southerly for a distance of ninety-two and sixth-three hundredths (92.63') to a rebar for a corner;

Thence turning an interior angle of 106° -13' -14" and running westerly for a distance of one thousand one hundred fifty (1150.00') to a point, bounding southerly on land now or formerly of this grantor;

Thence turning an angle of 71° -44' -28" and running northerly for a distance of one hundred ninety-nine and eighty-nine hundredths (199.89') to a point, bounding westerly on land now or formerly of the grantor;

Thence turning an interior angle of 118° -15' -32" and running easterly for a distance of one thousand one hundred fifty feet (1150.00') bounding northerly on land now or formerly of this grantor, to the point and place of beginning, said last course forming an interior angle of 69° -58' -42" with the first described course.

Said parcel is also referred to as a portion of Lot 3 on a plan entitled "Subdivision of Land in West Greenwich, R.I., prepared for Ray Stewart by Allen, Demurgian, Major and Witsch, Inc., June 1987, scale 1" = 200'.

Said parcel contains 5.00 acres, more or less.

Subject to the restriction that no residence may be constructed of less than 2000 square feet of living space plus a two-car garage.

# EXHIBIT B



MIN# ████████████

# NOTE

May 31, 2006             WARWICK             RHODE ISLAND
    [Date]                       [City]                   [State]

199 HUDSON POND ROAD, WEST GREENWICH, RI  02817

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 414,400.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is NEW CENTURY MORTGAGE CORPORATION, a California Corporation.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      5.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st      day of each month beginning on July 1, 2006      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on June 1, 2036      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 18400 Von Karman, Suite 1000, Irvine, CA  92612 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,451.34      .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

████████

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**



-5N (0207).01      Form 3200 1/01

     VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3      Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

 

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)            _____ (Seal)
ROBERT TED BROWN            -Borrower                                                    -Borrower

_____ (Seal)            _____ (Seal)
                                          -Borrower                                                    -Borrower

_____ (Seal)            _____ (Seal)
                                          -Borrower                                                    -Borrower

_____ (Seal)            _____ (Seal)
JOSEPH J. DEANGELIS      WITNESS   XXXXXXXX                                             -Borrower

Pay to the order of:                    Pay to the order of:

Countrywide Home Loans, Inc.            _____         [Sign Original Only]

Without Recourse                        Without Recourse
Countrywide Bank, N.A.                  Countrywide Home Loans, Inc.

By: _Laurie Meder_                      By: _Michele Sjolander_
Laurie Meder, SVP                       Michele Sjolander, SVP



PAY TO THE ORDER OF
Countrywide Bank, N.A.

WITHOUT RECOURSE
NEW CENTURY MORTGAGE CORPORATION

BY:_____

Marlene K. White
Asst. Mgr. Warehouse Collateral

Client Reference Number:

# NOTE ALLONGE

This Note Allonge refers to the Note described herein.

Note Date:          5/31/2006

Note Amount:        414400

Borrower:           ROBERT BROWN

Original Lender:    MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION, A CALIFORNIA CORPORATION.

Property Address:   199 HUDSON POND ROAD, WEST GREENWICH, RI  2817

Pay to the Order of

Without Recourse

**US BANK NATIONAL ASSOCIATION AS LEGAL TITLE TRUSTEE FOR**

**TRUMAN 2016 SC6 TITLE TRUST**

Name:       Alejandro J. Lopez

Title:      Senior Vice President

# EXHIBIT C

Return To:

Home123 Corporation
13100 Northwest Freeway, Suite 200
Houston, TX 77040

THIS IS TO CERTIFY
THAT THIS IS A TRUE
AND CORRECT COPY OF
THE ORIGINAL

BY:

Prepared By:

Home123 Corporation
13100 Northwest Freeway, Suite 200
Houston, TX 77040

000767

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

MIN █████████████

2006 MAY 31 PH 1:34

TOWN CLERK
WEST GREENWICH, R.I.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated May 31, 2006
together with all Riders to this document.
**(B) "Borrower"** is   ROBERT TED BROWN, A Married Man

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS.

█████████

**RHODE ISLAND** - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS                                     Form 3040  1/01 (rev. 11/02)

(VMP) -6A(RI) (0208)

Page 1 of 15                 Initials:

VMP MORTGAGE FORMS - (800)521-7291

**(D) "Lender"** is NEW CENTURY MORTGAGE CORPORATION, a California Corporation.

Lender is a Corporation
organized and existing under the laws of California
Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA  92612

**(E) "Note"** means the promissory note signed by Borrower and dated May 31, 2006
The Note states that Borrower owes Lender Four Hundred Fourteen Thousand Four Hundred And 00/100
Dollars
(U.S. $414,400.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than June 1, 2036
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider           ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider       ☐ Other(s) [specify]:

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used





-6A(RI) (0208)                Page 2 of 15            Initials:        Form 3040   1/01 (rev. 11/02)

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS, (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the
County            of            Kent            :
[Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]
See Exhibit "A" attached hereto and incorporated herein by reference for all purposes.

Parcel ID Number: 045 0004-20

199 HUDSON POND ROAD
WEST GREENWICH
("Property Address"):

which currently has the address of
[Street]
[City], Rhode Island 02817            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials:

VMP -6A(RI) (0208)            Page 3 of 15            Form 3040   1/01 (rev. 11/02)

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

 

-6A(RI) (0208)                                 Page 4 of 15                 Initials: ___   Form 3040   1/01 (rev. 11/02)

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the





lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with





-6A(RI) (0208)                               Page 6 of 15                    Initials: __    Form 3040   1/01 (rev. 11/02)

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable





-6A(RI) (0208)  Page 7 of 15  Initials: _____  Form 3040  1/01 (rev. 11/02)

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**



-6A(RI) (0208)

Page 8 of 15



Initials

Form 3040   1/01 (rev. 11/02)

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



-6A(RI) (0208)          Page 9 of 15          Initials:     Form 3040   1/01 (rev. 11/02)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



-6A(RI) (0208)                    Page 11 of 15                    Form 3040    1/01 (rev. 11/02)

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



-6A(RI) (0208)

Page 12 of 15



Initials: ___

Form 3040   1/01 (rev. 11/02)

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Outstanding Automatic Orders in Domestic Relations Cases.** Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

**25. Homestead Estate.** If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.



VMP®-6A(RI) (0208)

Page 13 of 15



Initials: _____    Form 3040  1/01 (rev. 11/02)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
JOSEPH J. DEANGELIS

_____ (Seal)
ROBERT TED BROWN                    -Borrower

_____

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower



-6A(RI) (0208)                   Page 14 of 15              Form 3040   1/01 (rev. 11/02)

**STATE OF RHODE ISLAND, Kent**                                                    County ss:

On this   31ST        day of May, 2006                         , in     WARWICK                    ,
in said County, before me personally appeared     **ROBERT TED BROWN, A Married Man**

each and all to me known and known to me to be the person(s) executing the foregoing instrument and acknowledged said execution to be his/her/their free act and deed.

_____
Notary Public      JOSEPH J. DEANGELIS
                   MY COMMISSION EXPIRES: 6/25/09

-6A(RI) (0208)                          Page 15 of 15               Initials: ___      Form 3040   1/01 (rev. 11/02)

## EXHIBIT "A"

That certain parcel of land situated on the westerly side of Liberty Road in the Town of West Greenwich, County of Kent, State of Rhode Island and Providence Plantations, bounded and described as follows;

Beginning at the northeasterly corner of said parcel, at a steel rebar on the westerly street line of Liberty Road, 3950, more or less, feet northerly of the intersection with Falls River Road, at the southeasterly corner of land now or formerly of this grantor;

Thence southerly along the westerly line of Liberty Road for a distance of one hundred seven and thirty-seven hundredths (107.37') feet to an angle point in said road;

Thence turning an interior angle of 183° -48' -04" and continuing southerly for a distance of ninety-two and sixth-three hundredths (92.63') to a rebar for a corner;

Thence turning an interior angle of 106° -13' -14" and running westerly for a distance of one thousand one hundred fifty (1150.00) to a point, bounding southerly on land now or formerly of this grantor;

Thence turning an angle of 71° -44' -28" and running northerly for a distance of one hundred ninety-nine and eighty-nine hundredths (199.89') to a point, bounding westerly on land now or formerly of the grantor;

Thence turning an interior angle of 118° -15' -32" and running easterly for a distance of one thousand one hundred fifty feet (1150.00') bounding northerly on land now or formerly of this grantor, to the point and place of beginning, said last course forming an interior angle of 69° -58' -42" with the first described course.

Said parcel is also referred to as a portion of Lot 3 on a plan entitled "Subdivision of Land in West Greenwich, R.I., prepared for Ray Stewart by Allen, Demurgian, Major and Nitsch, Inc., June 1987, scale 1" = 200'.

Said parcel contains 5.00 acres, more or less.

Subject to the restriction that no residence may be constructed of less than 2000 square feet of living space plus a two-car garage.

# EXHIBIT D

<    🏛  BankFind Suite Home

Back to Search Results

# Countrywide Bank, FSB

Download Results

Data as of 09/26/2025

| Institution Details | Locations | History | Financials | Other Names |
|---|---|---|---|---|

## 19 Historical Events

Results Per Page  [ 25 ▼ ]   ◀  **1**  ▶   [       ]   Go To Page

| | Description of Event | View Details |
|---|---|---|
| 08/30/1990 | Institution established. Original name: Treasury Bank (33143). | ℹ |
| 09/01/1992 | Main Office moved to 1155 Fifteenth Street, N.W., Suite 515, Washington, DC 20005. | ℹ |
| 05/17/2001 | Institution becomes member of the Federal Reserve System. | ℹ |
| 05/17/2001 | Changed Chartering Agency to OCC. | ℹ |
| 05/17/2001 | Changed Bank Class to N. | ℹ |
| 05/17/2001 | Changed Institution Name to Effinity Bank, National Association. | ℹ |
| 05/17/2001 | Reorganized banking operations. | ℹ |
| 06/06/2001 | Changed Institution Name to Treasury Bank, National Association. | ℹ |
| 06/21/2001 | Main Office moved to 1199 North Fairfax Street, Suite 500, Alexandria, VA 22314. | ℹ |
| 09/06/2005 | Changed Institution Name to Countrywide Bank, National Association. | ℹ |
| 03/12/2007 | Institution withdraws from membership in the Federal Reserve System. | ℹ |
| 03/12/2007 | Changed Chartering Agency to OTS. | ℹ |
| 03/12/2007 | Changed Bank Class to SB. | ℹ |

| | | |
|---|---|---|
| 03/12/2007 | Changed Organization Type to STOCK SAVINGS BANK. |  |
| 03/12/2007 | Changed Primary Federal Regulatory Agency to OTS. | |
| 03/12/2007 | Changed Institution Name to Countrywide Bank, FSB. | |
| 01/16/2009 | Maintained operations with government open bank assistance. | |
| 02/04/2009 | Main Office moved to 6465 Greenwood Plaza #200, Centennial, CO 80111. | |
| 04/27/2009 | Merged and became part of Bank of America, National Association (3510) in Charlotte, NC. | |

*Data prior to 01/01/2000 may include small anomalies which may or may not effect the historic events of this institution. If you have questions or concerns, please contact the FDIC using the link above.

top of page ↑    ◄    **1**    ►    Go To Page

# EXHIBIT E



**Comptroller of the Currency
Administrator of National Banks**

Large Bank Licensing, MS 7-13
250 E Street, S.W.
Washington, D.C.  20219

**Conditional Approval #900**

April 23, 2009                                                                                 **May 2009**

Ms. Radhi Thayu
Assistant General Counsel
Bank of America Corporation
NY 1-100-18-07
One Bryant Park
New York, NY 10036

      Re:    Applications by Countrywide Bank, FSB to convert to a national bank charter and
               by Bank of America, National Association, to acquire by merger the national bank
               that results from the conversion of Countrywide FSB.
               Application Control Numbers: 2009-ML-01-0003; 2009-ML-02-0003

Dear Ms. Thayu:

The Office of the Comptroller of the Currency ("OCC") hereby grants conditional approval to
the conversion and merger applications described below, for the reasons and subject to the
requirements set forth herein.  This conditional approval is granted after a thorough review of the
application, other materials you have supplied, and other information available to the OCC,
including commitments and representations made in the application and by the applicants'
representatives during the application process.  This approval is also subject to the conditions set
out herein.

**I.  INTRODUCTION**

On February 17, 2009, Countrywide Bank, FSB, Centennial, Colorado ("Countrywide" or
"Countrywide FSB"), filed an application to convert to a national bank charter to be titled
Countrywide Bank, National Association ("BANA-Colorado"), also with its main office in
Centennial, Colorado.  On the same day, Bank of America, National Association, Charlotte,
North Carolina ("BANA") filed an application to acquire BANA-Colorado by merger.  Deposits
of Countrywide and BANA are insured by the Federal Deposit Insurance Corporation ("FDIC"),
and each is a wholly-owned indirect subsidiary of Bank of America Corporation, Charlotte,

North Carolina ("BAC").[1]  Likewise, BANA-Colorado will be FDIC insured and an indirect, wholly-owned subsidiary of BAC.  BANA has branches in 32 states including Texas and Virginia.  Countrywide has branches in two states, Texas and Virginia, but does not seek to retain those branches following the conversion.[2]  Pursuant to the merger application, BANA seeks to retain its own main office and branches and also seeks to retain Countrywide's main office in Colorado as a branch.[3]  Following consummation of the proposed transactions, BANA also seeks to retain several subsidiaries of Countrywide.[4]

Notice of the proposed transactions was published in Charlotte, North Carolina, and Denver, Colorado.  The OCC received no comment letters as a result of the public comment period; however, the Division of Banking of the Colorado Department of Regulatory Agencies ("Division of Banking" and "Division of Banking letter") sent a letter to the OCC upon receiving a copy of the applications from the applicants.

---

[1]  BAC is a bank holding company for purposes of the Bank Holding Company Act and a financial holding company under the Gramm-Leach-Bliley Act.

[2]  BANA filed applications with the OCC to establish its own branches at the sites of the Countrywide branches in Texas and Virginia and these branches were approved by the OCC in March.  Letters by Stephen A. Lybarger, Large Bank Licensing Lead Expert, to Wade Hampton, Bank of America (March 9, 2009).

[3]  BANA currently has no branches in Colorado.

[4]   The OCC originally approved what is now Countrywide FSB to engage in banking under the Code of the District of Columbia under the name "Treasury Bank" in August 1990 and the Bank opened shortly thereafter with its main office in Washington, D.C.  Following its acquisition by Countrywide Credit Industries, Inc., Treasury Bank converted to a national bank charter in 2001, changed its name to "Effinity Bank, National Association" and relocated its main office to Virginia.   The name was subsequently changed to "Treasury Bank, National Association" later in 2001 and changed again to Countrywide Bank, National Association in 2005.  On March 12, 2007, Countrywide converted from a national bank charter to a federal savings bank charter with the approval of the Office of Thrift Supervision ("OTS") and changed its name to Countrywide Bank, FSB.  On July 1, 2008, Countrywide FSB, along with its various affiliates, was acquired by BAC.  On December 24, 2008,  pursuant to OTS procedures and requirements, Countrywide FSB filed an application with the OTS to establish a branch office in Centennial, Colorado, relocate its home office from Virginia to the branch office site in Colorado, and retain its former Virginia home office as a branch.  Letter from Jerry A. Hager, Executive Vice President, Deputy General Counsel, Countrywide Bank FSB, to Applications Manager, OTS West Region (December 24, 2008).  The application was approved by the OTS on February 2, 2009.  Letter from Steven M. Gregovich, Assistant Regional Director, OTS West Region (February 2, 2009).  Countrywide FSB then relocated its home office to Centennial, Colorado, on February 4, 2009.  Counsel for the applicant has represented that Countrywide FSB engages in providing products and services at the Colorado main office that are the same as the products and services it engaged in at its prior home office in Virginia.

- 2 -

## II.  LEGAL AUTHORITY

### A.  Conversion of Countrywide

Countrywide may convert to a national bank charter.  Regulations of both the OCC and the OTS permit the direct conversion of a federal savings bank into a national bank.[5]  In deciding a conversion application, OCC regulations provide that the OCC takes into account whether the institution can operate safely and soundly as a national bank in compliance with applicable laws, regulations, and policies.[6]  The regulations further provide that an application may be denied if a significant supervisory, Community Reinvestment Act ("CRA"),[7] or compliance concern exists with the applicant; approval is inconsistent with applicable law, regulation, or policy; or the applicant fails to provide necessary information that the OCC has requested.[8]  Finally, the regulations provide that a conversion application may be denied if the conversion would permit the applicant to escape supervisory action by its current regulator.[9]

The OCC has conducted a thorough review of the conversion application in light of the factors set forth above and determined that the results of this review are consistent with approval of the conversion application.[10]

---

[5]  12 C.F.R. § 5.24; 12 C.F.R. § 552.2-7.  The OCC has approved many such conversions.  *See, e.g.,* Decision of the Applications by TCF Financial Corp. to convert Federal Savings Banks Located in Minnesota, Michigan, Illinois, and Wisconsin into National Banks (OCC Corporate Decision No. 97-113, February 24, 1997).

Section 5.24(d)(2)(ii)(E) of the OCC's regulations provides that the conversion of a federal savings bank must not be in contravention of federal law.  Sections 552.2-7 and 563.22(b)(1)(ii) of the OTS regulations require either the filing of a notice or application to the OTS.  Countrywide filed a conversion application with the OTS on February 17, 2009, noting that the conversion was the first step of a two-step process with the second step being the merger of Countrywide into BANA.  Letter from Mr. Hager to Applications Manager, OTS West Region (February 17, 2009).  The OTS approved the conversion application on March 25, 2009.  Letter from Mr. Gregovich to Mr. Hager (March 25, 2009.  You have advised the OCC that BAC has consulted with Federal Reserve Board staff under the Bank Holding Company Act with respect to Countrywide's conversion to a bank charter and been advised that no filing with the FRB was required because the converted bank would exist only for a moment in time.

[6] 12 C.F.R. § 5.24(d)(1).

[7]  The CRA itself also requires that the OCC must consider a conversion applicant's record of compliance with CRA in deciding the application. 12 U.S.C. § 2903(a)(2) and 2902(3)(A); 12 C.F.R. § 25.29(a)(4).  Consideration of Countrywide's record of compliance with CRA will be discussed subsequently.

[8]  12 C.F.R. §§ 5.24(d) and 5.13(b).

[9]  12 C.F.R. § 5.24(d).  The conversion raises no issues regarding branching since BANA-Colorado will retain no branches following the conversion.  Moreover, no issues regarding retention of nonconforming assets or activities arise since none have been identified.  Retention by BANA and BANA-Colorado of Countrywide subsidiaries will be discussed subsequently.

[10]  Applicant has requested waivers from the residency requirements imposed on board members of a national bank under 12 U.S.C. § 72.  Since BANA-Colorado will exist for only a moment before its merger into BANA, the OCC hereby grants the requested waivers.

### B. Merger of BANA-Colorado into BANA

Mergers of insured banks with different home states are authorized under 12 U.S.C. § 1831u(a)(1), which was adopted as part of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (the "Riegle-Neal Act").[11]

### 1. Compliance with Riegle-Neal Act requirements

An application to engage in an interstate transaction under 12 U.S.C. § 1831u is also subject to certain requirements and conditions set forth in the Riegle-Neal Act. These conditions are compliance with state-imposed age minimums, if any, which cannot exceed five years; compliance with certain state filing requirements; compliance with certain deposit concentration limits; community reinvestment compliance; and adequacy of capital and management skills. The following discusses these requirements.[12]

### a. Age requirements

The proposed merger satisfies state-imposed age requirements permitted by § 1831u(a)(5). Under that section, the OCC may not approve a merger under section 1831u(a)(1) "that would have the effect of permitting an out-of-State bank . . . to acquire a bank in a host state[13] that has not been *in existence* for the minimum period of time, if any, specified in the statutory law of the host state."[14] The maximum age requirement, however, that a state is permitted to impose is five years.[15] Colorado imposes a five-year age requirement.[16]

---

[11] The "home state" of a national bank is the state where its main office is located; the "home state" of a state bank is the state by which it was chartered. 12 U.S.C. § 1831u(g)(4)(A)(i), (ii). Riegle-Neal permitted a state to elect to prohibit such interstate transactions involving their home state banks if they did so between September 29, 1994, and May 31, 1997. Neither North Carolina nor Colorado exercised this opt-out authority.

[12] Because interstate mergers of federal savings banks and national banks are not covered by the Riegle-Neal Act, or may raise branch retention issues, federal savings banks seeking to enter into merger transactions have converted first into national banks to bring them within the scope of Riegle-Neal prior to the merger or to take advantage of certain branch retention rights provided by 12 U.S.C. § 1464(i)(5). The OCC has consistently approved such transactions. *See, e.g.,* Conditional Approval 823 (September 21, 2007) (conversion of MidAmerica Bank, FSB, Clarendon, Illinois, prior to merger into National City Bank, Cleveland, Ohio); CRA Decision 139 (April 20, 2007) (conversion of Capital One F.S.B., McLean, Virginia, prior to its merger with Capital One, National Association, New Orleans, Louisiana); Corporate Decision 2006-08 (August 3, 2006) (conversion of Citibank, Federal Savings Bank, Reston, Virginia, and Citibank(West) FSB, San Francisco, California, prior to their merger with Citibank, National Association, Las Vegas, Nevada); Corporate Decision 2004-09 (May 18, 2004) (conversion of First Security Federal Savings Bank, Chicago, Illinois, with interstate branches, prior to merger with MB Financial Bank, N.A., Chicago, Illinois); Corporate Decision 2000-03 (March 8, 2000) (conversion of Family Bank FSB, Haverhill, Massachusetts, with interstate branches, prior to merger with First Massachusetts Bank, N.A., Worcestor, Massachusetts); Corporate Decision 99-34 (October 1, 1999) (conversion of Bank of America, FSB, Salt Lake City, Utah, prior to merger with Bank of America, National Association, Charlotte, North Carolina).

[13] A "host state" is defined as a state, other than the home state of a bank in which the bank seeks to establish and maintain a branch. 12 U.S.C. § 1831u(g)(5).

[14] 12 U.S.C. § 1831u(a)(5)(A) (emphasis added).

[15] 12 U.S.C. § 1831u(a)(5)(B).

As previously discussed, Countrywide FSB was originally authorized to engage in banking in 1990 and has been either a national bank or a federal savings bank since 2001, well more than five years. Nothing in the Riegle-Neal Act requires that the amount of time that a bank has existed, and thus its age, is altered by a bank's relocation from one state to another.[17]

Countrywide's existence as a federal savings bank for about two years beginning in 2007 also does not affect Countrywide's age. For purposes of the Riegle-Neal Act, including the age requirement, "bank" is defined to include "any former savings association."[18] "Savings association," for these purposes, includes "any Federal savings association."[19] As stated, at the time of the consummation of the merger, Countrywide will have been in existence as a bank and as a "former federal savings bank" since 1990 and, thus, complies with the five-year age requirement imposed by Colorado law consistent with the Riegle-Neal.[20]

---

[16]  Colo. Rev. Stat. Ann. §§ 11-104-201(2)(West 2003 & Supp. 2007-2008).

[17]  *Id.* at § 1831u(a)(5)(A). *See also TeamBank, N.A. v. Missouri,* 279 F.3d 614 (8th Cir. 2002) (giving deference to and upholding OCC determination that bank that had relocated into state of Missouri less than five years earlier satisfied Missouri five-year age requirement on grounds, among others, that Riegle-Neal requirement measured age of bank for these purposes based on the amount of time that it was in "existence").

[18]  12 U.S.C. § 1813(a)(1)(B).

[19]  *Id.* at § 1813(b)(1)(A).

[20]  Moreover, Colorado statutes imposing an age requirement, even if they were controlling on whether to calculate the age of a bank based on a period of time other than the length of the bank's "existence," do not link the state's five-year age requirement to the amount of time that a target institution has been located in Colorado. In adopting interstate banking and branching, the Colorado legislature declared:

> The general assembly further finds and declares that . . . interstate branching through the acquisition of a branch of an insured financial institution without the acquisition of such financial institution that has been in operation for at least five years at the time of acquisition is expressly prohibited.

Colo. Rev. Stat. Ann. at § 11-104-201(2).

Moreover, this state statute applies the age requirement to both federal savings banks and national banks. For purposes of this statute, "financial institution" means any bank or federal savings bank, *id.* at §11-101-401(36), and "bank" includes national banks and state banks. *Id.* at § 11-101-401(5). It could hardly be argued that an institution that was in existence for the past 19 years as a national bank, District of Columbia bank or federal savings bank, and for the past eight years as a national bank or federal savings bank does not meet the five-year age requirement.

Colorado law also provides:

> An out-of-state bank holding company may not acquire control of, or acquire all or substantially all of the assets of, a Colorado depository institution having its principal place of business in Colorado unless such depository institution has been in operation for at least five years as the time of the acquisition of control.

*Id.* at § 11-104-202(2). The term "depository institution" is not defined for purposes of this provision, though "depository institution" is defined elsewhere in the banking code to include a legal entity chartered under the laws of the United States to receive deposits and which is supervised or examined by an agency of the United States. *Id.* at § 11-71-102(b)(3)(a)(1) and (5). Moreover, under applicable federal law, "depository institution" includes banks

- 5 -

### b. Filing requirements

The proposed transaction meets the applicable Riegle-Neal Act filing requirements. A bank applying for an interstate transaction under section 1831u(a) must (1) "comply with the filing requirements of any host State of the bank which will result from such transaction" as long as the filing requirements do not discriminate against out-of-state banks and are similar in effect to filing requirements imposed by the host state on out-of-state nonbanking corporations doing business in the host state; and (2) submit a copy of the application to the state bank supervisor of the host state.[21]

BANA has represented that it has provided a copy of the application to the Colorado Division of Banking. Consequently, this aspect of the filing requirements is satisfied.[22]

The Colorado interstate bank merger statute, however, also requires an out-of-state bank, before acquiring a Colorado bank in a merger, to obtain a certificate from the Banking Board certifying that the acquisition complies with state law.[23] Some of the information required to be provided to the Colorado department may be consistent with the filing requirement provision of the Riegle-Neal Act. However, this statute includes authority for the state banking board to approve or deny an application, a role not provided for under the Riegle-Neal Act. Such feature is substantially different from the qualifying to do business process for nonbanking corporations.[24]

---

and federal savings banks. 12 U.S.C. § 1813(c)(1), (a)(1), and (b)(1)(A). At any rate, as will be discussed subsequently, nothing in this state statute prohibits a bank from acquiring, through a merger, a depository institution that is at least five years old, which is already owned by the same bank holding company as the acquiring bank and which has its main office in Colorado.

[21] 12 U.S.C. § 1831u(b)(1).

[22] The Colorado statute also requires the filing of a copy of the application with the banking board. Colo. Stat. Ann. § 11-104-202(9).

[23] The statute provides:

> No bank or bank holding company may conduct interstate branching in Colorado, or acquire control, directly or indirectly, of any Colorado financial institution without first obtaining a certificate from the banking board certifying that such branch or acquisition complies with the provisions of this article . . . . If the banking board refuses to issue a certificate . . . , such refusal and the reasons therefore shall be submitted pursuant to subsection (9) of this section to the appropriate federal regulatory agency with advisory comments. The banking board shall act on any application or notice filed pursuant to subsection (9) of this section and shall issue or refuse to issue the certificate required by this subsection within ninety days after the filing of any such application.

*Id.* at § 11-104-203(10). For purposes of this provision, a "Colorado financial institution" includes a state bank, national bank, or federal savings bank with its principal place of business in Colorado. *Id.* at § 11-101-401(5), (15), and (36).

[24] In contrast to the certification requirement applicable to banks, Colorado law provides that a "foreign entity" shall not transact business or conduct activities in Colorado until a "statement of foreign entity authority" is filed with the secretary of state. *Id.* at § 7-90-801. For these purposes, a "foreign entity" is defined to include a "foreign corporation . . . or any other organization or association that is formed under a statute or common law of a

To the extent that the Colorado statute imposes filing requirements beyond those permitted by the Riegle-Neal Act, such additional requirements are not applicable to the proposed merger. To the extent that the Colorado statute is interpreted and administered consistently with Riegle-Neal, it applies, and BANA must comply to that extent.

While not acknowledging that the Colorado Banking Board had jurisdiction to approve the proposed merger and retention of the former main office of BANA-Colorado as a branch, BANA did submit a filing to Colorado seeking certification.[25] Consequently, we conclude that BANA has complied with Colorado's filing requirements to the extent that they are permissible under the Riegle-Neal Act. [26]

### c. Deposit concentration limits

The proposed merger does not raise issues with respect to the deposit concentration limits of the Riegle-Neal Act. Section 1831u(b)(2) places certain nationwide and statewide deposit concentration limits on interstate transactions. However, interstate transactions involving only affiliated banks are specifically exempt from these provisions.[27] As discussed, BANA and BANA-Colorado are affiliates; thus, the Riegle-Neal deposit concentration limits are inapplicable to this transaction.[28]

### d. Expanded community reinvestment compliance

The proposed interstate transaction also does not raise issues with respect to the special community reinvestment compliance provisions of the Riegle-Neal Act. In determining whether to approve an application for an interstate merger under section 1831u(a), the OCC must (1)

---

jurisdiction other than this state . . ." and "foreign corporation" means "an entity formed under the law of a jurisdiction other than this state that is functionally equivalent to a domestic corporation." *Id.* at § 7-90-102(22) and (23). A "statement of foreign entity authority" to be filed with the secretary of state must state the entity's true and assumed names; the jurisdiction under the law of which it was formed; the form of the entity; its principal office address; the name and address of its registered agent; and the date it commenced or expects to commence business activities in the state. *Id.* at § 7-90-803. The statute further provides that a foreign entity is authorized to transact business or conduct activities in Colorado "from the effective date of its statement of foreign entity authority . . . ." *Id.* at 7-90-805.

[25] For a more complete discussion of the extent to which state filing requirements do not apply in a Riegle-Neal transaction because they exceed the limitations imposed on such filing requirements by the Riegle-Neal Act, *see* OCC Corporate Decision 96-29, pp. 11-15 (May 20, 1996); OCC Corporate Decision 97-43, pp. 3-4 (June 12, 1997) (specifically addressing the Colorado filing statute).

[26] The Banking Board denied BANA's request for certification. Letter by Fred J. Joseph, Acting State Bank Commissioner, Colorado Division of Banking, to Radhi Thayu, Assistant General Counsel, Bank of America (April 16, 2009) ("Banking Board Letter"). This denial will be discussed subsequently.

[27] 12 U.S.C. § 1831u(b)(2)(E).

[28] Even if one viewed this transaction as a merger between a national bank and a federal savings bank, the deposit cap still would not apply since the deposit cap applies only to mergers under the Riegle-Neal Act, which does not govern mergers between banks and federal savings banks.

comply with its responsibilities under section 804 of the CRA;[29] (2) take into account the CRA evaluations of any bank that would be an affiliate of the resulting bank; and (3) take into account the applicant bank's record of compliance with applicable state community reinvestment laws.[30] However, these provisions do not apply to transactions, such as this, between affiliated banks.[31] Thus, this Riegle-Neal Act provision is inapplicable.  However, the CRA itself is applicable and will be addressed subsequently.

### e.  Capital and management

The proposal must satisfy the adequacy of capital and management skills requirements in the Riegle-Neal Act.[32]  The OCC may approve an application for an interstate merger transaction under § 1831u(a) only if each bank involved in the transaction is adequately capitalized as of the date the application is filed and the resulting bank will continue to be adequately capitalized and adequately managed upon consummation of the transaction.[33]  The OCC has determined that these standards are satisfied.

### 2.  Bank Merger Act and Community Reinvestment Act Compliance

In addition to compliance with the Riegle-Neal Act, a proposed merger also must be evaluated under the standards set for in the Bank Merger Act,[34] and the Community Reinvestment Act.[35]

---

[29]  12 U.S.C. § 2903.

[30]  12 U.S.C. § 1831u(b)(3).

[31]  *Id.*  Expanded CRA does not apply where the resulting bank, BANA in this case, would have a branch or a bank affiliate in any state in which it had no branch or bank affiliate immediately prior to the transaction.  In this case, expanded CRA does not apply because BANA and BANA-Colorado are affiliates prior to the merger.
[32]  12 U.S.C. § 1831u(b)(4).

[33]  12 U.S.C. § 1831u(b)(4).  The term "adequately capitalized" for these purposes has the same meaning as used with respect to prompt corrective action.   12 U.S.C. § 1831u(g)(1).

[34]  12 U.S.C. § 1828(c)(2)(A).

[35]  12 U.S.C. §§ 2902(3)(E) and 2903(a)(2) and 12 C.F.R. § 25.29(a)(3).

### a.  **Bank Merger Act**

The OCC reviewed the proposed merger under the criteria of the Bank Merger Act[36] and applicable OCC regulations and policies.  Among other matters, we found that the proposed mergers would not have any anticompetitive effects.  The OCC considered the financial and managerial resources of the banks, their future prospects, and the convenience and needs of the communities to be served.  In addition, the Bank Merger Act requires the OCC to consider ". . . the effectiveness of any insured depository institution involved in the proposed merger transaction in combating money laundering activities, including in overseas branches."[37]  We considered these factors and found them consistent with approval under the statutory provisions.

### b.  **Community Reinvestment Act**

The CRA requires the OCC to take into account the applicants' record of helping to meet the credit needs of the community, including low- and moderate-income ("LMI") neighborhoods, when evaluating certain applications, including conversions and merger transactions that are subject to the Bank Merger Act.[38]  The OCC considers the CRA performance evaluation of each institution involved in the transaction.

In the February 12, 2008 Performance Evaluation ("PE"), issued by the OTS, Countrywide FSB received an overall "needs to improve" CRA rating.  As reflected in its PE, Countrywide FSB's performance under the lending, investment and service tests was consistent with an overall rating of "satisfactory."  However, the rating was lowered to "needs to improve" because the most recent comprehensive examination indicated evidence of discriminatory credit practices on a prohibited basis.  Countrywide FSB and BAC have represented that Countrywide is taking the actions committed to the OTS related to the fair lending matters that resulted in a CRA rating downgrade.  In October 2008, BAC entered into a settlement agreement with eleven state Attorney Generals ("AGs") who were pursuing legal action against Countrywide Financial Corporation and its subsidiaries, including Countrywide FSB, because of alleged deceptive lending practices and violations of state consumer laws.  BAC's settlement with the state AGs, requires, among other things, making appropriate modifications to subprime and option ARM loans underwritten by Countrywide Financial Corporation's subsidiaries and a commitment to improving lending practices at Countrywide entities.  The merger of Countrywide FSB into BANA does not diminish the obligations undertaken by BAC pursuant to the settlement with the state AGs.

Because Countrywide FSB will cease to exist upon completion of the merger, and BANA intends to put in place its existing CRA policies, procedures and practices, at all former

---

[36]  12 U.S.C. § 1828(c).

[37]  12 U.S.C. § 1828(c)(11).

[38]  12 U.S.C. § 2903; 12 C.F.R. § 25.29.

Countrywide FSB business locations, approval of the conversion and merger applications is not inconsistent with the requirements under CRA.

In the December 31, 2006 PE, issued by the OCC, BANA received an overall "outstanding" CRA rating. As reflected in its PE, BANA also received an "outstanding" rating on its lending, investment and service tests. The OCC's review of BANA's overall record, and other information available to the OCC as a result of its regulatory responsibilities, revealed no evidence that BANA is not meeting the credit needs of its communities, including LMI neighborhoods. BANA's CRA programs for meeting the credit needs of the communities, including LMI neighborhoods, of the resulting bank will remain in place. In addition, BANA has the experience and expertise to fully address the credit practices at Countrywide that led to the "needs to improve" CRA rating and the state AGs' allegations concerning deceptive lending at Countrywide.

### C.   Retention of main offices and branches

Upon consummation of the merger, BANA proposes to retain its own main office and branches and to retain the main office of BANA-Colorado in Centennial, Colorado as a branch of BANA.[39] The Riegle-Neal Act provides that, subject to the approval of the OCC, following an interstate merger, the resulting bank may "retain and operate, as a main office or a branch, any office that any bank involved in an interstate merger transaction was operating as a main office or a branch immediately before the merger transaction."[40] Consequently, upon consummation of the mergers, BANA may retain its own main office and branches and designate the main office of BANA-Colorado as a branch.

As noted, the Colorado Banking Board on April 16, 2009, denied BANA's application for certification of the transaction as proposed.[41] In a separate letter to the OCC, however, the Banking Board stated that "the Colorado State Banking Board and the Colorado Division of Banking have no objection to the conversion and subsequent merger of Countrywide Bank, a Federal Savings Bank into Bank of America, National Association, so long as the transaction is approved without establishing an interstate branch bank in Colorado."[42] As discussed, however, once an interstate merger transaction is determined to satisfy the requirements of the Riegle-Neal Act, retention of the main offices and branches of the merging parties is permissible with the approval of the appropriate federal regulator.

Moreover, as stated, while the Riegle-Neal Act permits states to require compliance with certain filing requirements, it does not give state regulators authority to approve or disapprove interstate

---

[39] Applicant represents that the branch site at the location of the former main office in Colorado will provide lending and deposit services to customers including opening deposit accounts, receiving deposits by check, applying for mortgage loans, meeting with loan officers, and receipt of loan repayments.

[40] 12 U.S.C. § 1831u(d)(1).

[41] *See, supra,* n.26.

[42] Letter by Mr. Fred F. Joseph, Acting Colorado State Bank Commissioner, to Stephen Lybarger, Large Bank Licensing Lead Expert, OCC (April 16, 2009).

merger transactions between banks, including, as in the present case, where both parties to the merger are national banks.  Nevertheless, while the state regulator has no authority to approve or disapprove branch retention by national banks following Riegle-Neal mergers, the OCC has considered the Colorado Banking Board's views in making its determination.[43]

In denying certification, the Banking Board stated:

> [BANA's] application to operate the Centennial Colorado facility as an interstate branch of BANA does not comply with the requirements of 11-104-202. . . . Specifically, the Banking Board found that neither Countrywide Bank, a Federal Savings Bank (CWFSB) or its anticipated successor Countrywide Bank, National Association (CWBNA) are functional depository financial institutions with a principal place of business in Colorado; and that the operations of CWFSB/CWBNA are not principally conducted in Colorado.[44]

The Board's position appears to be grounded on paragraph (2) of § 11-104-202, which provides:

> An out-of-state bank holding company may not acquire control of, or acquire all or substantially all of the assets of, a Colorado depository institution having its principal place of business in Colorado unless such depository institution has been in operation for at least five years at the time of the acquisition of control.

Colorado's argument appears to be that unless an out-of-state holding company acquires a depository institution that meets age requirements and has its principal place of business in Colorado, the out-of-state holding company cannot acquire a bank in Colorado and, thus, branch into Colorado.  This argument fails for several reasons.  First, what is proposed is not the acquisition by a bank holding company of a depository institution.  The bank holding company, Bank America Corporation, already owns the depository institution, Countrywide FSB, and Countrywide FSB is already located in Colorado.[45]  Second, the transaction is an acquisition by a bank, BANA, which does not appear to be covered by this provision.  Third, the Riegle-Neal Act applies to mergers between national banks with main offices in different states and is not dependent on the location of the merging banks' principal places of business.[46]

---

[43]  Colorado law does state that "if the banking board refuses to issue a certificate . . ., such refusal and the reasons therefor shall be submitted . . . to the appropriate federal regulatory agency with advisory comments."  Colo. Rev. Stat. Ann. § 11-104-202((10).

[44]  Banking Board Letter.

[45]  As previously noted, "Colorado depository institution" is not defined for these purposes, but based on other definitions of the term "depository institution" in both Colorado banking law and federal law, the term could be read to include national banks and federal savings banks. *See, supra,* n. 20.

[46]  12 U.S.C. § 1831u(a)(1) and (g)(4).  Colorado law does not appear to define the "principal place of business" of a bank.  Rather, the law defines the term "operations are principally conducted" as "the state where the largest percentage of the aggregate deposits of all bank subsidiaries of the bank holding company are held."  Colo. Stat. Ann. § 11-101-401(48).  At any rate, even if this definition were applied to the merging banks themselves, the state where a national bank holds the largest percentage of its deposits is irrelevant for purposes of interstate mergers under the Riegle-Neal Act.

Rather, the one provision in the Colorado interstate banking and branching statutes that clearly addresses retention of branches by out-of-state banks as a result of interstate acquisitions states only that branches cannot be retained "without the acquisition of [the] financial institution." [47]  In fact, in this transaction, BANA is acquiring an entire financial institution. [48]

### D.  Retention of subsidiaries

Following the conversion of Countrywide into BANA-Colorado, and BANA-Colorado's merger into BANA, BANA will retain ReconTrust Company, National Association, an uninsured, nondepository national bank with trust powers headquartered in Thousand Oaks, California ("Recon NA").   Recon NA is currently a subsidiary of Countrywide.  A national bank may own a subsidiary national bank that engages in activities limited to trust powers. [49]

---

To the extent that Colorado's argument under § 11-104-202 questions the activities of Countrywide FSB in Colorado and the permissibility of the relocation of the home office of Countrywide FSB from Virginia into Colorado, the OTS has made that determination and the OCC has no jurisdiction over relocations of federal savings banks.  We note, however, that the applicant has represented that the Colorado home office of the Countrywide FSB is engaging in providing the same products and services as provided at its former home office in Virginia.

[47]  Colo. Stat. Ann § 11-104-201(2).  *See, supra,* n. 20.  For these purposes, "financial institution" includes national banks and federal savings banks, among others.  *Id.* at § 11-101-401(5), (36).

[48]  The Division of Banking letter filed by the Colorado Division of Banking in response to its receipt of a copy of the applications from the applicants stated that "de novo branching in Colorado is expressly prohibited."  While this is true with respect to interstate de novo branching, BANA's application does not involve interstate de novo branching.  Under Riegle-Neal, a de novo branch is a branch that (i) is originally established by the national bank as a branch; and (ii) does not become a branch of such bank as a result of – (I) the acquisition by the bank of an insured depository institution; or (II) the conversion, merger, or consolidation of any such institution . . . ."  12 U.S.C. § 36(g)(3)(A).  While "depository institution" in this context is not expressly defined, section 36(g), including the definition of "de novo branch" is identical to 12 U.S.C. § 1828(d)(4), which governs interstate de novo branching by state nonmember banks.  Because § 1828(d)(4), which was adopted simultaneously with § 36(g), is codified as part of Chapter 16 of Title 12, it takes on the definition of "insured depository institution" found in § 1813(c)(2), which includes national banks and federal savings associations.  Consequently, a branch acquired by a national bank through a merger with another bank, or a merger with or conversion of a federal savings bank, is not within the definition of a "de novo branch" as set forth in § 36(g)(3)(A) or § 1828(d)(4)(C).  Moreover, such a facility would not appear to be a de novo branch under Colorado law, which tracks the definitions of "de novo branch" found in § 36(g) and § 1824(d)(4).  Colo. Stat. Ann. at § 11-101-401(28).  Rather, the acquisition by BANA of a branch in Colorado arises from a merger of two national banks under the Riegle-Neal Act, not from the establishment of a de novo branch in Colorado by BANA.

[49]  *See, e.g.,* OCC Conditional Approval 687 (August 25, 2005) ("Conditional Approval 687").  This approval addressed the acquisition by PNC Bank, National Association ("PNC") of assets and liabilities of Riggs Bank National Association ("Riggs").  The approval noted that among the assets that PNC would acquire were Riggs's shares in Riggs Bank National Trust Company ("Riggs NTC"), a national bank limited to trust powers that was an operating subsidiary of Riggs.  The approval stated that national banks are permitted to own limited purpose trust companies as operating subsidiaries that engage only in activities permissible for national banks.  We note that Recon Trust already is a national bank and, thus, can engage only in activities permissible for national banks.

We note also that Conditional Approval 687 stated that OCC regulations require a filing for a change in control

- 12 -

Upon BANA's acquisition of Countrywide by merger, Recon Trust Company ("Recon") will briefly become an operating subsidiary of BANA. We note BANA has represented that about a month after consummation of its acquisition of Countrywide, Recon will merge into Recon NA and cease to exist. This merger was approved by the OCC on April 15, 2009.[50]

BANA also is authorized to retain CWB Community Assets, Inc. ("CBW") under 12 C.F.R. Part 24. CBW is a community development corporation, which holds all of Countrywide's CRA investments, primarily low income tax credit partnership interests. CBW also operates a grant program for CRA lending.

### III. Section 1818 conditions

These approvals are subject to the following conditions:

1. Prior to consummation of the conversion, as approved, BANA shall execute an operating agreement ("Operating Agreement") with the OCC. The Operating Agreement shall provide, among other requirements, that not later than 30 days after consummation of the conversion, the Bank shall enter into an agreement, acceptable to the OCC, with its direct and indirect holding companies, Bank America Corporation, NB Holdings Corporation, BAC North America Holding Corporation, and BANA Holding Corporation (the "Holding Companies"), pursuant to which the Holding Companies agree to indemnify BANA for losses and related expenditures, as specified, that may be incurred directly or indirectly by BANA or any of its subsidiaries, including, but not limited to Recon NA, arising from the acquisition, directly or indirectly, of specified assets or interests in specified assets, or any activity assumed by BANA or any of its subsidiaries, including Recon NA, with respect to such assets or interests in such assets.

2. The Board of Directors shall assure that the Operating Agreement is fully adopted, timely implemented, and adhered to thereafter.

These conditions of approval are conditions "imposed in writing by a Federal Agency in connection with any action on any application, notice or other request" within the meaning of 12 U.S.C. § 1818. As such, the conditions are enforceable under 12 U.S.C. § 1818.

---

of a limited purpose national trust bank. 12 C.F.R. § 5.50(b). However, the regulation exempts a transaction that is subject to review under the Bank Merger Act. *Id.* at § 5.50(c)((2)(iii). Because the merger of Countrywide, the parent of Recon NA, into BANA is subject to the Bank Merger Act, no change in control filing is required.

[50]    Countrywide also represents that it owns two dormant companies, CB Securities Holdings I, Inc., and CB Securities Holdings II, Inc., both Delaware corporations formed in connection with an anticipated transaction that was never consummated. Countrywide represents that neither of these companies engages in any activities or holds any assets and liabilities. If BANA intends to activate one or both of these entities, BANA should notify the OCC and follow the appropriate procedures under 12 C.F.R. § 5.34.

## IV.  Conclusion

For the reasons set forth above, and subject to the commitments and representations made in the applications and by representatives of the applicants, the section 1818 conditions set forth above, and subject to the receipt by the applicants of all other applicable regulatory approvals, nonobjections and waivers, the OCC approves the following:

■  the conversion of Countrywide FSB to a national bank;

■  the waiver of the residency requirement under 12 U.S.C. § 72 as applied to a majority of directors of BANA-Colorado;

■  the merger of BANA-Colorado into BANA;

■  the retention by BANA of its main office and branches following consummation of the merger of Countrywide into BANA and the retention of the main office of BANA-Colorado in Centennial, Colorado, as a branch of BANA; and

■  the retention of subsidiaries as previously described.

You have six months to consummate the conversions and mergers from the date of this decision. The conditional approval will automatically terminate unless the OCC grants an extension of the time period.  The OCC generally is opposed to granting extensions, except under extenuating circumstances and expects the conversions and mergers to occur as soon as possible.

This approval, and the activities and communications by OCC employees in connection with these filings, do not constitute a contract, express or implied, or any other obligation binding upon the OCC, the United States, any agency or entity of the United States, or any officer or employee of the United States, and do not affect the ability of the OCC to exercise its supervisory, regulatory, and examination authorities under applicable law and regulations.  Our conditional approval is based on Countrywide's and BANA's representation, submission, and information available to the OCC as of this date.  The OCC may modify, suspend, or rescind this approval if a material change in the information on which the OCC relied occurs prior to the date of the transactions to which this decision pertains.  The foregoing may not be waived or modified by any employee or agent of the OCC or the United States.

In the event of questions, I may be contacted by e-mail, Stephen.Lybarger@occ.treas.gov or at (202) 874-5294.  Please include the application control numbers in all correspondence.

Sincerely,

*signed*

Stephen A. Lybarger
Large Bank Licensing Lead Expert

- 14 -

# EXHIBIT F

INST #   1170   Bk #   411   Pg #   102

Recording Requested By:
**Bank of America**
Prepared By: Diana DeAvila
888-603-9011
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

DocID#  ▮▮▮▮▮▮▮▮
Property Address:
199 Hudson Pond Rd
West Greenwich, RI 02817-1958
BJO-AM 11741914          12/1/2011

RECEIVED FOR RECORD
Dec 12, 2011 03:17:02P
West Greenwich, R.I.
JANET E. OLSSON
TOWN CLERK

MIN #: ▮▮▮▮▮▮          MERS Phone #: 888-679-6377

This space for Recorder's use

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 3300 S.W. 34TH AVENUE, SUITE 101 OCALA, FL 34474 does hereby grant, sell, assign, transfer and convey unto **BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING, LP** whose address is 400 NATIONAL WAY, SIMI VALLEY, CA 93065 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Original Lender:  **NEW CENTURY MORTGAGE CORPORATION, A CALIFORNIA CORPORATION**

Borrower(s):  **ROBERT TED BROWN, A MARRIED MAN**

Date of Mortgage:  5/31/2006

Original Loan Amount:  $414,400.00

Recorded in West Greenwich Township, RI on: 5/31/2006, book 318, page 016 and instrument number 000767

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on

Dated: _____ 12-02-11

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By: _____
Tina LeRaybaud, Assistant Secretary

State of California
County of Ventura

On __DEC 2 2011__ before me, __Becki E. Cameron, Notary Public__, Notary Public, personally appeared __Tina LeRaybaud__, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: _____ **Becki E. Cameron** _____ (Seal)
My Commission Expires: __May 28, 2014__

BECKI E. CAMERON
COMM. # 1881243
NOTARY PUBLIC-CALIFORNIA
VENTURA COUNTY
My Commission Expires
MAY 28, 2014

# EXHIBIT G

ו Recorded Return To:
:omm Global Services
 Country Drive
aul, MN 55117

ıred By:
Strandmo
:omm Global Services
 Country Drive
aul, MN 55117

INST: 257  Bk: 459  Pg: 198

RECEIVED FOR RECORD
Apr 22,2014 02:59:43P
West Greenwich, R.I.
ERIN LIESE
TOWN CLERK

# Assignment of Mortgage


Rec. 2nd
.ea: April 15, 2014

Loan:

' value received Bank of America, N.A. successor by merger to BAC Home Loans Servicing, LP
:A Countrywide Home Loans Servicing, LP, by Indecomm Global Services its attorney in fact,
ı05 Corporate Drive, Plano, TX 75024, the undersigned hereby grants, assigns and transfers to
hristiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual
apacity but as Trustee of ARLP Trust 3, in c/o Altisource Asset Management Corporation, 402
Strand Street, Frederiksted, VI 00820, all beneficial interest under a certain Mortgage dated May 31,
2006 executed by ROBERT TED BROWN, A MARRIED MAN and recorded in Book 318 on Page(s) 016
as Document Number 000767 on May 31, 2006 in the office of the Town Clerk of West Greenwich
Town, Rhode Island.

PROPERTY ADDRESS: 199 Hudson Pond Rd, West Greenwich, RI 02817

Bank of America, N.A. successor by merger to BAC
Home Loans Servicing, LP FKA Countrywide Home
Loans Servicing, LP, by Indecomm Global Services
its attorney in fact

By:

Marcy Kay Koopman,
Assistant Secretary

INST:      257   Bk:   459   Pg:   199

STATE OF **Minnesota**      )

COUNTY   **Ramsey**      ) SS

On **April 15, 2014** before me, **Pang Mee Yang** , Notary Public in and for said State personally appeared **Marcy Kay Koopman** , **Assistant Secretary of Bank of America, N.A. successor by merger to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP, by Indecomm Global Services its attorney in fact,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her authorized capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

Pang Mee Yang, Notary Public
My Commission expires: **January 31, 2017**

**PANG MEE YANG**
Notary Public-Minnesota
My Commission Expires Jan 31, 2017

# EXHIBIT H

INST:          215   Bk:   472   Pg:   172

Recording Requested By:
OCWEN LOAN SERVICING, LLC

When Recorded Return To:

OCWEN LOAN SERVICING, LLC
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID 83401

RECEIVED FOR RECORD
Apr 02,2015 01:51:34P
West Greenwich, R.I.
ERIN LIESE
TOWN CLERK

## CORPORATE ASSIGNMENT OF MORTGAGE

West Greenwich Town, Rhode Island
SELLER'S SERVICING #:          "BROWN"
SELLER'S LENDER ID#:
OLD SERVICING #:

Date of Assignment: March 16th, 2015
Assignor: Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual capacity but as Trustee of ARLP Trust 3 by it's attorney in fact Ocwen Loan Servicing, LLC at 1661 WORTHINGTON RD, SUITE 100, WEST PALM BEACH, FL 33409
Assignee: WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT AS TRUSTEE OF ARLP SECURITIZATION TRUST, SERIES 2014-1 at C/O OCWEN LOAN SERVICING, LLC., 1661 WORTHINGTON ROAD, STE 100, WEST PALM BEACH, FL 33409

Executed By: ROBERT TED BROWN, A MARRIED MAN  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS
Date of Mortgage: 05/31/2006 Recorded: 05/31/2006 In Book/Reel/Liber: 318 Page/Folio: 016 as Instrument No.: 000767 In West Greenwich Town, State of Rhode Island.

Property Address: 199 HUDSON POND ROAD, WEST GREENWICH, RI 02817

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $414,400.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual capacity but as Trustee of ARLP Trust 3 by it's attorney in fact Ocwen Loan Servicing, LLC
On _____ MAR 2 0 2015

By: _____
    Vicki Pasyol____, Authorized
Signer

STATE OF ____ Iowa
COUNTY OF ____ Black Hawk          REBECCA DAMME

On MAR 2 0 2015, before me, _____, a Notary Public in and for Black Hawk in the State of ____ Iowa____, personally appeared ____ Vicki Pasyol____, Authorized Signer, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
REBECCA DAMME

REBECCA DAMME
COMMISSION NO.786690
MY COMMISSION EXPIRES
OCTOBER 28, 2017

# EXHIBIT I

Fay Servicing, LLC
PO Box 9002
Temecula, CA 92589-9002



PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

Send Payments to:
Fay Servicing, LLC
Attn: Payment Processing
PO Box 3187
Carol Stream, IL   60132-3187

20170417-256

Send Correspondence to:
Fay Servicing, LLC
Attn: Customer Service Dept
PO Box 809441
Chicago, IL  60680-9441

Robert Ted Brown
199 HUDSON POND RD
WEST GREENWICH, RI  02817-1958



W_GEN_DEMAND



04/17/2017

Robert Ted Brown
199 HUDSON POND RD
WEST GREENWICH, RI 02817-1958

Loan Number:            ▮▮▮▮▮▮
Property Address:        199 Hudson Pond Rd
                         West Greenwich, RI 02817

Dear Robert Ted Brown:

This letter is formal notice by Fay Servicing, LLC, the Servicer of the above-referenced loan, on behalf of Wilmington Trust National Association not in its individual capacity but as Trustee of ARLP Securitization Trust Series 2014-1, that you are in default under the terms of the documents creating and securing your Loan described above, including the Note and Deed of Trust/Mortgage/Security Deed ("Security Instrument"), for failure to pay amounts due.

You have a right to cure your default. To cure the default, you must pay the full amount of the default on this loan by 05/22/2017 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter). Failure to cure the default on or before this date may result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding where applicable, and sale of the property.

As of the date of this notice, the total amount required to cure the default is $50,365.44, which consists of the following:

| | | |
|---|---|---|
| Next Payment Due Date: | | 10/01/2015 |
| Total Monthly Payments Due: | | $48,552.68 |
| 10/01/2015 | at | $2,506.34 |
| 11/01/2015 | at | $2,506.34 |
| 12/01/2015 | at | $2,506.34 |
| 01/01/2016 | at | $2,506.34 |
| 02/01/2016 | at | $2,506.34 |
| 03/01/2016 | at | $2,506.34 |
| 04/01/2016 | at | $2,506.34 |
| 05/01/2016 | at | $2,506.34 |
| 06/01/2016 | at | $2,506.34 |
| 07/01/2016 | at | $2,506.34 |
| 08/01/2016 | at | $2,506.34 |
| 09/01/2016 | at | $2,506.34 |
| 10/01/2016 | at | $2,506.34 |
| 11/01/2016 | at | $2,661.71 |
| 12/01/2016 | at | $2,661.71 |
| 01/01/2017 | at | $2,661.71 |
| 02/01/2017 | at | $2,661.71 |
| 03/01/2017 | at | $2,661.71 |
| 04/01/2017 | at | $2,661.71 |
| Late Charges: | | $473.25 |



W_GEN_DEMAND    Rev.03/2017
Page 1 of 4

| Other Charges: | Uncollected NSF Fees: | $0.00 |
| | Other Fees: | $0.00 |
| | Corporate Advance Balance: | $1,339.51 |
| | Unapplied Balance: | ($0.00) |

**TOTAL YOU MUST PAY TO CURE DEFAULT:**                                    **$50,365.44**

You can cure this default by making a payment of $50,365.44 by 05/22/2017. Please note any additional monthly payments, late charges and other charges that may be due under the Note, Security Instrument and applicable law after the date of this notice must also be paid to bring your account current. You may contact our Loss Mitigation Department at 8004957166 to obtain updated payment information. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current default. Please include your loan number and property address with your payment and send to:

Fay Servicing, LLC
PO Box 88009
Chicago, IL 60680-1009

If you wish to dispute the delinquency, or if you dispute the calculation of amount of the delinquency and reinstatement amount, you may contact us by calling 8004957166.

IF YOU ARE UNABLE TO BRING YOUR ACCOUNT CURRENT, Fay Servicing, LLC offers consumer assistance programs designed to help resolve delinquencies and avoid foreclosure. These services are provided without cost to our customers. You may be eligible for a loan workout plan or other similar alternative. If you would like to learn more about these programs, you may contact the Loss Mitigation Department at 8004957166, Monday to Thursday 8:00am to 9:00pm CST Friday 8:30am to 5:00pm CST Saturday 10:00am to 4:00pm CST. You may also visit our website www.fayservicing.com. WE ARE VERY INTERESTED IN ASSISTING YOU.

You have the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and sale. If foreclosure proceedings are undertaken, we may pursue a deficiency judgment, if permitted by applicable law. Failure to respond to this letter may result in the loss of your property. To the extent your obligation has been discharged or is subject to the automatic stay in a bankruptcy case, this notice is for informational purposes only and does not constitute a demand for payment or an attempt to collect a debt as your personal obligation. If you are represented by an attorney, please provide us with the attorney's name, address and telephone number.

**Fay Servicing, LLC is attempting to collect a debt, and any information obtained will be used for that purpose. Unless you notify us within thirty (30) days after receiving this notice that you dispute the validity of this debt or any portion thereof, we will assume this debt is valid. If you notify us within thirty (30) days from receiving this notice that you dispute the validity of this debt or any portion thereof, we will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. Upon your written request within thirty (30) days after the receipt of this letter, we will provide you with the name and address of the original creditor, if the original creditor is different from the current creditor.**

You are notified that this default and any other legal action that may occur as a result thereof may be reported to one or more local and national credit reporting agencies by Fay Servicing, LLC.

**Attention Servicemembers and Dependents**: Servicemembers on active duty, or a spouse or dependent of such a servicemember, may be entitled to certain protections under the Servicemembers Civil Relief Act

("SCRA") regarding the servicemember's interest rate and the risk of foreclosure. SCRA and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances. If you are currently in the military service, or have been within the last twelve (12) months, **AND** joined after signing the Note and Security Instrument now in default, please notify Fay Servicing, LLC immediately. When contacting Fay Servicing, LLC as to your military service, you must provide positive proof as to your military status. Servicemembers and dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. Homeowner counseling is also available at agencies such as Military OneSource (www.militaryonesource.mil; 1-800-342-9647) and Armed Forces Legal Assistance (http://legalassistance.law.af.mil), and through HUD-certified housing counselors (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact us toll-free at 8004957166 if you have questions about your rights under SCRA.

For your benefit and assistance, there are government approved homeownership counseling agencies designed to help homeowners avoid losing their homes. To obtain a list of approved counseling agencies, please call 1-800-569-4287 or visit http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm. You may also contact the Homeownership Preservation Foundation's Hope hotline at 1-888-995-HOPE (4673).

This matter is very important. Please give it your immediate attention.

Sincerely,

Fay Servicing, LLC
440 S LaSalle St, Suite 2000
Chicago, IL 60605
8004957166

# EXHIBIT J

Bk: 516 Pg: 104
INST: 824

Prepared By and Return To:
Paul Pugzlys
Collateral Department
Meridian Asset Services, Inc.
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

APN/PIN# ▮▮▮▮▮▮▮

Loan No: ▮▮▮▮▮▮
Sver Ln No: ▮▮▮▮▮

RECEIVED FOR RECORD
Jul 25, 2017 10:36A
West Greenwich, R.I.
ERIN LIESE
TOWN CLERK

_____ Space above for Recorder's use _____

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT AS TRUSTEE OF ARLP SECURITIZATION TRUST, SERIES 2014-1**, whose address is **C/O ALTISOURCE ASSET MANAGEMENT CORPORATION, 36C STRAND STREET, CHRISTIANSTED, USVI 00820**, (ASSIGNOR), does hereby grant, assign and transfer to **US BANK NATIONAL ASSOCIATION AS LEGAL TITLE TRUSTEE FOR TRUMAN 2016 SC6 TITLE TRUST**, whose address is **U.S. BANK CORPORATE TRUST SERVICES, DOCUMENT CUSTODY SERVICES, 1133 RANKIN STREET, SUITE 100, ST. PAUL, MN 55116, EP-MN-TMZD**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: **5/31/2006**
Original Loan Amount: **$414,400.00**
Executed by (Borrower(s)): **ROBERT TED BROWN**
Original Lender: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION, A CALIFORNIA CORPORATION, ITS SUCCESSORS AND ASSIGNS**
Filed of Record: In Mortgage Book/Liber/Volume 318, Page 016,
Document/Instrument No: 000767 in the Recording District of **WEST GREENWICH TOWNSHIP, RI**, Recorded on 5/31/2006.

Property more commonly described as: **199 HUDSON POND ROAD, WEST GREENWICH, RHODE ISLAND 02817**

 ▮▮▮▮ Ocwen-Fav ▮▮▮▮

Bk: 516  Pg: 105
INST:    824



IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: 6-29-17

WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT AS TRUSTEE OF ARLP SECURITIZATION TRUST, SERIES 2014-1, BY MERIDIAN ASSET SERVICES, INC., ITS ATTORNEY-IN-FACT

By: MATTHEW KRUEGER
Title: VICE PRESIDENT

Witness Name: MAKAYLA MITCHELL

> A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of       FLORIDA
County of    PINELLAS

On 6/29/17 , before me, JAMIE OLGIA, a Notary Public, personally appeared MATTHEW KRUEGER, VICE PRESIDENT of/for MERIDIAN ASSET SERVICES, INC., AS ATTORNEY-IN-FACT FOR WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT AS TRUSTEE OF ARLP SECURITIZATION TRUST, SERIES 2014-1, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of FLORIDA that the foregoing paragraph is true and correct. I further certify MATTHEW KRUEGER, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): JAMIE OLGIA
My commission expires: 04/12/2020

JAMIE OLGIA
MY COMMISSION # FF 981386
EXPIRES: April 12, 2020
Bonded Thru Budget Notary Services

Ocwen-Fay

# EXHIBIT K

# HARMON LAW OFFICES, P.C.

150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
TEL (617) 558-0500
FAX (617) 244-7304
Business Hours: Monday-Friday 8:00 AM-to 5:30 PM
*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

June 30, 2017

Mr. Robert Ted Brown
199 HUDSON POND RD
WEST GREENWICH, RI 02817

RE:     Mortgage on 199 Hudson Pond Road, West Greenwich, Rhode Island

Dear Mr. Brown:

This office has been retained by Fay Servicing, LLC to foreclose on a mortgage dated May 31, 2006 from Robert Ted Brown to Mortgage Electronic Registration Systems, Inc., as nominee, for New Century Mortgage Corporation, its successors and assigns, in the original principal amount of $414,400.00. Our client informs us that you are in breach of the conditions of the loan documents. We have been instructed to bring a foreclosure in the name of U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust under the Power of Sale contained in your mortgage and by entry. You are further notified that the note is hereby accelerated and the entire balance is due and payable forthwith and without further notice. Even though the note has been accelerated, you may still have the right to reinstate the loan. If so, and if you desire to reinstate the loan, you will need to pay an amount of money sufficient to bring the loan fully current.

Under the terms of the note and mortgage, there is outstanding through the date of this letter $325,000.00 in principal and $52,607.03 in interest and other charges for a total of **$377,607.03**. Furthermore, attorney's fees and costs and other charges will continue to accrue pursuant to the terms of the loan documents.

You may order a reinstatement or payoff 24 hours a day on-line by going to www.hloreinstatement.com or to www.hlopayoff.com. Please follow the instructions contained on the web page. Please note that only requests made by owners, borrowers, mortgagors and authorized parties will be processed. You may also contact us during business hours to request a reinstatement or payoff by calling (617) 558-0598. When completing the on-line form or when calling our office, please reference your Case Number 201702-0205 so that we may process your request more quickly.

201702-0205                    FCL

/Acceleration    Letter    Bankruptcy
Discharged/Brown, Robert

You are further notified that since you have been discharged in a Chapter 7 bankruptcy, you are not personally liable for this obligation, but the Holder may proceed to foreclose as described herein if the default is not cured.

Unless you, within thirty days after receipt of this notice, dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by this office.  If you notify this office in writing within the thirty-day period that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by this office. Upon your written request within the thirty-day period, this office will provide you with the name and address of the original creditor, if different from the current creditor.

The law does not require this office to wait until the end of the thirty-day period before proceeding with legal action to collect the debt.  If, however, you request in writing verification of the debt, or any portion thereof, or the name and address of the original creditor within the thirty-day period which begins with your receipt of this notice, the law requires this office to suspend its efforts (through litigation or otherwise) to collect the debt until it mails the required information to you. However, if you notify this office in writing within the thirty-day period described in the previous paragraph that the debt, or any portion thereof, is disputed, or that you request the name and address of the original creditor, this office shall cease collection of the debt, or any disputed portion thereof, until this office obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to you by this office.

Your failure to dispute the validity of the debt may not be construed by any court as an admission of liability by you.

Very truly yours,

Jason MacKeen

JMY/JAN/201702-0205

CERTIFIED  MAIL NO.
RETURN RECEIPT REQUESTED

**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Certified Article Number

9414 7266 9904 2102 0861 54

SENDER'S RECORD

# HARMON LAW OFFICES, P.C.

150 CALIFORNIA STREET
NEWTON, MASSACHUSETTS 02458
TEL (617) 558-0500
FAX (617) 244-7304
Business Hours:  Monday-Friday 8:00 AM-to 5:30 PM
*SERVING MASSACHUSETTS, NEW HAMPSHIRE AND RHODE ISLAND*

June 30, 2017

Mr. Robert Ted Brown
199 HUDSON POND RD
WEST GREENWICH, RI 02817

RE:    Mortgage on 199 Hudson Pond Road, West Greenwich, Rhode Island

Dear Mr. Brown:

This office has been retained by Fay Servicing, LLC to foreclose on a mortgage dated May 31, 2006 from Robert Ted Brown to Mortgage Electronic Registration Systems, Inc., as nominee, for New Century Mortgage Corporation, its successors and assigns, in the original principal amount of $414,400.00. Our client informs us that you are in breach of the conditions of the loan documents. We have been instructed to bring a foreclosure in the name of U.S. Bank National Association as Legal Title Trustee for Truman 2016 SC6 Title Trust under the Power of Sale contained in your mortgage and by entry.  You are further notified that the note is hereby accelerated and the entire balance is due and payable forthwith and without further notice.  Even though the note has been accelerated, you may still have the right to reinstate the loan. If so, and if you desire to reinstate the loan, you will need to pay an amount of money sufficient to bring the loan fully current.

Under the terms of the note and mortgage, there is outstanding through the date of this letter $325,000.00 in principal and $52,607.03 in interest and other charges for a total of **$377,607.03**. Furthermore, attorney's fees and costs and other charges will continue to accrue pursuant to the terms of the loan documents.

You may order a reinstatement or payoff 24 hours a day on-line by going to www.hloreinstatement.com or to www.hlopayoff.com.  Please follow the instructions contained on the web page.  Please note that only requests made by owners, borrowers, mortgagors and authorized parties will be processed.  You may also contact us during business hours to request a reinstatement or payoff by calling (617) 558-0598.  When completing the on-line form or when calling our office, please reference your Case Number 201702-0205 so that we may process your request more quickly.

You are further notified that since you have been discharged in a Chapter 7 bankruptcy, you are not personally liable for this obligation, but the Holder may proceed to foreclose as described herein if the default is not cured.

Unless you, within thirty days after receipt of this notice, dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by this office.  If you notify this office in writing within the thirty-day period that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by this office. Upon your written request within the thirty-day period, this office will provide you with the name and address of the original creditor, if different from the current creditor.

The law does not require this office to wait until the end of the thirty-day period before proceeding with legal action to collect the debt.  If, however, you request in writing verification of the debt, or any portion thereof, or the name and address of the original creditor within the thirty-day period which begins with your receipt of this notice, the law requires this office to suspend its efforts (through litigation or otherwise) to collect the debt until it mails the required information to you. However, if you notify this office in writing within the thirty-day period described in the previous paragraph that the debt, or any portion thereof, is disputed, or that you request the name and address of the original creditor, this office shall cease collection of the debt, or any disputed portion thereof, until this office obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to you by this office.

Your failure to dispute the validity of the debt may not be construed by any court as an admission of liability by you.

Very truly yours,

Jason MacKeen

JMY/JAN/201702-0205

**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**